IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DONALD MOYER, :
:
    Plaintiff :
: CASE NO. 1:10-CV-0456
    v. :
:
PA TURNPIKE COMMISSION, : Judge Sylvia H. Rambo
:
    Defendant :
:

# M E M O R A N D U M

In this civil rights case, Plaintiff Donald Moyer ("Moyer") alleges that Defendant PA Turnpike Commission ("the Commission") violated 42 U.S.C. § 1983, and the Pennsylvania Whistleblower Act, 43 Pa. Cons. Stat. Ann. §§ 1421-1428, by terminating his employment on May 10, 2007. Before the court is the Commission's motion for summary judgment. The motion is ripe for disposition.

**I.**      **Background**

    **A.**      **Facts**

The material facts are not in dispute, and are taken substantially verbatim from the Commission's statement of material facts, which is supported with citations to the record, and which Moyer does not contest.

The Commission is a instrumentality of the Commonwealth of Pennsylvania and is statutorily charged with operating the Pennsylvania Turnpike ("Turnpike"), a 530-mile limited access, multi-lane toll road. (Doc. 26, Def.'s Stat. of Mat. Facts ("SMF") ¶ 1.) Vehicles enter and exit the Turnpike through fifty-seven interchanges. (*Id.* ¶ 3.) Entrance lanes automatically dispense toll tickets or register

E-Z Pass accounts and do not have assigned collectors. (*Id.* ¶ 4.) Exit lanes are either electronic, in which case a customer drives through the lane and the E-Z Pass account is charged for the toll, or manual, in which case the customer hands a toll collector the toll ticket and pays the fare in cash. (*Id.* ¶ 5.)

Moyer began employment with the Commission as a temporary toll collector on October 23, 1995. (*Id.* ¶ 6.) On March 26, 1997, Moyer was promoted to toll collector. (*Id.* ¶ 7.) At all times relevant hereto, Moyer was represented by Teamsters Local Union No. 77 ("Local 77") for collective bargaining purposes. The terms and conditions of Moyer's employment with the Commission, including the procedures by which the Commission could discipline Moyer, and Moyer's right to appeal any discipline, were covered by a collective bargaining agreement ("CBA") negotiated by the Commission and Local 77. (*Id.* ¶¶ 8-9.)

The CBA provided for a multi-step grievance procedure to provide an employee with due process in the event an employee is terminated. (*Id.* ¶ 10.) Pursuant to the CBA, and in accordance with applicable law, Local 77 retained the sole discretion as to whether to file a grievance on behalf of any employee who was disciplined. (*Id.* ¶ 11.) The grievance procedure in place during the relevant period set forth a four-step grievance procedure, the first three of which were internal to the Commission and the final step being binding arbitration. (*Id.* ¶ 12.) Local 77 retained the sole right to determine what matters it would move to binding arbitration. (*Id.* ¶ 13.)

On or about July 15, 2004, Local 77 filed Grievance 04-5-G-15 (1405) ("Grievance 1405") on Moyer's behalf alleging that the Commission had violated the CBA by failing to post or fill a vacancy. (*Id.* ¶ 15.) On or about July 21, 2004,

2

Local 77 filed Grievance 04-5-G-14 (1406) ("Grievance 1406") on Moyer's behalf, alleging the Commission had substantially interfered with his work and performance and had also created an intimidating, hostile, and offensive work environment. (*Id.* ¶ 16.) On August 12, 2004, First Step Hearings were held on Grievances 1405 and 1406. (*Id.* ¶ 17.) On August 17, 2004, the Commission notified Local 77 that Grievance 1405 was denied. (*Id.* ¶ 18.) On August 21, 2004, the Commission notified Local 77 that Grievance 1406 was denied. (*Id.* ¶ 19.) In September 2004, Local 77 appealed these denials to the Second Step. (*Id.* ¶¶ 20-21.) On May 26, 2005, the Commission notified Local 77 that grievances 1405 and 1406 had been denied at the Second Step because both grievances challenged the Commission's staffing level decisions, which was a right reserved to the Commission under the CBA. (*Id.* ¶ 25.) There is nothing in the record suggesting that Local 77 further prosecuted these grievances.

On March 30, 2005, Moyer was issued a written warning for incurring daily shortages of $5.00 or more during a thirty-day period. (*Id.* ¶ 22.) On April 4, 2005, Local 77 filed Grievance 05-5-G-009 (10776) ("Grievance 10776") objecting to the written warning. (*Id.* ¶ 23.) On May 2, 2005, a First Step hearing was held on Grievance 10776. (*Id.* ¶ 24.) On June 6, 2005, the Commission notified Local 77 that Grievance 10776 was denied. (*Id.* ¶ 26.)

On June 14, 2005, Moyer wrote to Pennsylvania State Senator James Rhoades alleging that his supervisor, Joseph R. Bodnar, had discriminated against him. (*Id.* ¶ 27.) On June 16, 2005, Senator Rhoades forwarded Moyer's letter to John Martino, the Commission's Director of Governmental Affairs, who then forwarded the letter to Patricia Schlegel, the Commission's Director of Human

Resources. (*Id.* ¶¶ 28-29.) On July 6, 2005, Schlegel wrote to Senator Rhoades to inform him that the Commission was investigating Moyer's complaints. (*Id.* ¶ 30.) Deborah Carpenter, a Commission EEO/ADA Specialist, was assigned to investigate Moyer's allegations of discrimination. (*Id.* ¶ 31.) Carpenter interviewed Moyer, Bodnar, and all the identified witnesses and concluded that there was no evidence that Moyer had suffered any discrimination.[1] (*Id.* ¶ 32.) Moyer was informed of this decision on November 29, 2005. (*Id.* ¶ 33.)

In 2006, Moyer contacted the Pennsylvania Auditor General's Office regarding the Commission's new fare collection computer system. (*Id.* ¶ 34.) Two representatives from the Auditor General's Office met with Moyer and two other Commission employees to discuss their allegations regarding the new Fare Collection computer system. (*Id.* ¶ 35.) Moyer does not recall whether he informed anyone at the Commission that he contacted the Auditor General's Office. (*Id.* ¶ 36.)

On April 13, 2006, Local 77 appealed Grievance 10776 – the grievance dealing with Moyer's alleged toll shortages – to the Second Step. (*Id.* ¶ 37.) On April 16, 2006, Moyer was issued a new warning letter for a violation of Fare Collection Bulletin No. 6.1, for having three daily shortages each amounting to $5.00 or more during a thirty-day period. On May 4, 2006, another toll collector at the interchange where Moyer worked wrote on his Tour of Duty Report that Moyer had taken two toll tickets from him to conduct an investigation and had not returned them

---

[1] While Moyer disagrees with the Commission's conclusion that he did not suffer any discrimination, he does not disagree that this was the conclusion of the Commission. (*See* Doc. 32-1, Pl.'s Resp. to Def.'s SMF, ¶ 32.)

4

by the end of his shift. (*Id.* ¶ 39.) Pursuant to Fare Collection Bulletin No. 6.4, each toll collector must turn in all of his or her tickets at the end of each shift. (*Id.* ¶ 40.)

On May 22, 2006, Moyer filed a grievance covering two shortages he had been charged with, one of which was for $128.50. (*Id.* ¶ 41.) Shortages over $25.00 are covered by Fare Collection Bulletin 6.1 — Large shortages. (*Id.* ¶ 42.) On the same day, Moyer also filed a grievance about faulty air conditioners in his assigned toll booth. (*Id.* ¶ 43.) Two days later, on May 24, 2006, Moyer was notified that an investigation had been initiated based on his alleged violation of Fare Collection Bulletin 6.4, and a separate investigation had been initiated based on this alleged violation of Fare Bulletin 6.1 – Large Shortages. (*Id.* ¶ 44.) That same day, Moyer's supervisor recommended that Moyer be suspended for two days for his violations of Fare Collection Bulletins 6.4 and 6.1. (*Id.* ¶ 45.) Moyer was notified that he was suspended for two days on June 20, 2006. (*Id.* ¶ 46.)

On June 29, 2006, Jeffrey H. Gribb, Director of the Office of Special Investigations for the Auditor General's Office, wrote to Moyer to inform him of the actions that the Auditor General's Office intended to take regarding his allegation. (*Id.* ¶ 47.) Moyer had no further contact with the Auditor General's Office after this. (*Id.* ¶ 48.)

On May 3, 2007, Moyer was notified in writing that he was required to attend a meeting at the Commission's Eastern Regional Office on May 10, 2007. (*Id.* ¶ 49.) At the meeting, Moyer had union representation and was informed that if he did not resign his position he would be terminated for theft. (*Id.* ¶¶ 50-51.) Moyer conferred in private with his union representative and made a phone call. (*Id.* ¶ 54.) Ultimately, Moyer decided not to resign and was immediately informed

5

verbally that his employment was terminated. (*Id.* ¶ 56.) According to Moyer's deposition testimony, when he asked the union representative whether he should resign from his position he was told the following:

> He told me just sign the paper — they're going to ask you to sign because you can't win, why fight them. They have too much money, that's what he told me. And that's when I asked him that there's no second chance, there's no second chance of filing anything.

(Doc. 28, Def.'s Ex. 20, Sept. 8, 2010 Dep. of Donald Moyer ("Moyer Dep.") at 42:17-22.) According to Defendants, Moyer did not specifically ask the union representative at the meeting to file a grievance on his behalf, and he does not recall if any time thereafter he requested the union file a grievance on his behalf. (SMF ¶¶ 57-58.) Moyer disputes this. Both parties point to Moyer's deposition to support their position. In his deposition, Moyer states, in response to questions from the Commission's attorney:

> Q: Okay. And you never specifically said to [the union representative at the meeting] I want to file a grievance?
> A: No, not at the point.
> Q: After that meeting and your conversation with the gentleman who turned up on behalf of the union, did you ever contact anyone in the union about filing a grievance?
> A: Not that I recall.
> Q: And why was that?
> A: Well, it's what he said. He was supposed to be there to represent me from the union and said just sign the paper. They got millions, that you're not going to win if you fight them.
> Q: Did you, after your termination, ever contact the union about any issue?
> A: I don't think I did after — no. I think I tried when they told me not to come to work. I think I tried to call Mark Rowe I believe, but I don't think I ever heard anything back.

6

> Q: Now, that would have been when you were suspended but before you were terminated; is that correct?
> A: Right.

(Moyer Dep. at 43:1-23.) This is the only evidence submitted by either party concerning whether Moyer asked Local 77 to grieve his termination.

On May 11, 2007, Moyer was formally notified in writing of his termination. (SMF ¶ 59.) Local 77 never notified the Commission either verbally or in writing of any intent to grieve or proceed to arbitration to challenge Moyer's termination. (*Id.* ¶ 60.) Moyer contacted an attorney on either May 12, 2007, or May 13, 2007, but he does not know if his attorney ever contacted Local 77. (*Id.* ¶¶ 61-62.)

### B. Procedural History

On December 15, 2009, Moyer filed a complaint in the Dauphin County Court of Common Pleas naming the Commission and Local 77 as Defendants. This case was removed by Local 77 on March 2, 2010. (Doc. 1.) On March 9, 2010, Local 77 filed a motion to dismiss the complaint. (Doc. 2.) On March 15, 2010, the Commission filed its answer. (Doc. 3.) On April 5, 2010, Moyer filed an amended complaint which restated his original claims and added an unfair labor practices claim against Local 77. (Doc. 9.) On April 20, 2010, the Commission filed an answer to the amended complaint. (Doc. 11.) On April 21, 2010, Local 77 filed a motion to dismiss Moyer's second amended complaint. (Doc. 13.) On May 21, 2010, Moyer filed a second amended complaint alleging claims against the Commission, but dropping all claims against Local 77. On June 2, 2010, the Commission filed its answer to Moyer's second amended complaint.

On October 15, 2010, the Commission filed the instant motion for summary judgment, its brief in support of that motion, as well as its statement of material facts and exhibits in support. (Docs. 26-28.) Moyer filed his brief in opposition to the motion for summary judgment and response to the Commission's statement of material facts on November 15, 2010. (Docs. 32-33.) A reply brief was due December 2, 2010, but none was filed.

## II. <u>Legal Standard: Summary Judgment</u>

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *accord Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001). A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the nonmoving party. *Id.* at 248. The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. *Saldana*, 260 F.3d at 232; *see also Reeder v. Sybron Transition Corp.*, 142 F.R.D. 607, 609 (M.D. Pa. 1992).

The moving party bears the initial burden of demonstrating the absence of a disputed issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Upon such a showing, the burden then shifts to the non-moving party to present "specific facts showing the existence of a genuine issue for trial." Fed. R.

8

Civ. P. 56(e). The nonmoving party may not simply sit back and rest on the allegations in its complaint; instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324 (internal quotations omitted); *see also Saldana*, 260 F.3d at 232 (citations omitted). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 322-23. "'Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance.'" *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

### III. Discussion

Moyer's claims arise under both federal and state law. In Count I, Moyer asserts, pursuant to 42 U.S.C. § 1983, that he was deprived of his due process rights guaranteed by the Fourteenth Amendment when his employment was terminated without due process of law. In Count II, Moyer asserts that his discharge also violated Pennsylvania's Whistleblower Law, 43 Pa. Cons. Stat. Ann. § 1421 *et seq*. The court will address each of these claims in turn.

#### A. Due Process Claims

Section 1983 states, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person

9

> within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 749 n. 9 (1999) (internal quotation omitted). To prevail in an action under § 1983, a plaintiff must demonstrate: (1) a violation of a right secured by the Constitution and the laws of the United States, and (2) that the alleged deprivation was committed by a person acting under color of state law. *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000); *Moore v. Tartler*, 986 F.2d 682, 685 (3d Cir. 1993). The parties do not dispute that at all relevant times the Commission, as an instrumentality of the Commonwealth of Pennsylvania, was acting under color of state law. Thus, Moyer's § 1983 claim turns on whether he can come forward with some evidence of a genuine issue of material fact that, if resolved in his favor, could lead a reasonable jury to conclude his termination violated federal law.

Moyer asserts that his termination violated the due process guarantees afforded by the Fourteenth Amendment because he was deprived of a Constitutionally protected property right without adequate due process. The property interest in question is Moyer's entitlement to continued employment. Because Moyer was a part of a unionized workforce employed pursuant to a collective bargaining agreement with a just cause provision, he has demonstrated a protected property interest in his employment. (*See* Doc. 28, Ex. 2 in Supp. of Mot. for Summ.

J., Agreement Between Commission and Local 77, eff. Oct. 1, 2004 - Sept. 30, 2004, ("CBA") at 35, Art. 25, § 1 (CBA "just cause" provision)); *see also, Wilson v. MVM, Inc.*, 475 F.3d 166, 177 (3d Cir. 2007) (recognizing that "employment contracts that contain a 'just cause' provision create a property interest in continued employment"); *Unger v. Nat'l Residents Matching Program*, 928 F.2d 1392, 1399 (3d Cir. 1991) (recognizing that a property interest protected under the Fourteenth Amendment arises "where the contract itself includes a provision that the state entity can terminate the contract only for cause"). Accordingly, Moyer has met his burden of coming forward with evidence that would establish a property interest in his employment.

        The focus, then, rests upon the question of due process, the essential elements of which are notice and a meaningful opportunity to be heard in a meaningful manner and a meaningful time under the circumstances. *See Cleveland Bd. of Educ. v. Loundermill*, 470 U.S. 532, 542 (1985). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Matthew v. Eldridge*, 424 U.S. 319, 334 (1976) (citation omitted). However, courts have consistently held that where a grievance procedure providing for binding arbitration is available in a collective bargaining agreement, that procedure serves to provide an aggrieved employee with all the process due pursuant to the Fourteenth Amendment. *See Dykes v. Se. Pa. Transp. Auth.,* 68 F.3d 1564, 1570 (3d Cir. 1995); *Jackson v. Temple Univ.,* 721 F.2d 931, 933 (3d Cir. 1983); *Hughes v. City of Bethlehem*, 294 F. App'x 701, 705 (3d Cir. 2008). Here, Moyer had a grievance procedure that afforded him the right to arbitrate his termination.

11

The CBA provided a four-step grievance procedure. The first three levels were internal to the Commission, but the last step provided for the right of Local 77 to request binding arbitration before a neutral, third-party arbitrator selected by the parties, or, in the event that the parties could not agree on an arbitrator, an arbitrator selected from a list of seven arbitrators provided by the State Bureau of Mediation with the arbitrator selected by process of elimination with each party alternately striking a name until one name remained. (*See* CBA at 38, Art. 23, § 1, Step 4.)

Based on the precedent in this Circuit, the court concludes that these procedural safeguards were adequate. *See Jackson,* 721 F.2d at 933 n. 2 ("The right to arbitrate provided . . . essentially the same due process safeguards which would have been available through an unbiased hearing. . . . Therefore, there is no due process violation in this case."); *see also Dykes,* 68 F.3d at 1572 ("Even where, as here, a plaintiff alleges that the defendants acted in concert to deprive him both of a meaningful hearing and of arbitration, we believe that the administrative process in place [permitting binding arbitration] has incorporated the safeguards . . . consistent with the demands of due process.").

The fact that Moyer did not file a grievance is immaterial. Certainly, Moyer was aware of the right to file a grievance as he had done so on other occasions with much less dire consequences at stake. *See, supra*, at 3-4 (discussing prior grievances). Thus, he had the opportunity to do so and he was aware of this opportunity, but, as his deposition makes clear, he did not assert this right. (*See* Doc. 28, Def.'s Ex. 20, Moyer Dep. at 43:1-23.) For his part, Moyer alleges that he attempted to contact the union and was told not to return to work and was "for all

12

intents and purposes 'shown the door' without his union even suggesting that a grievance be filed." (Doc. 32, Pl.'s Br. in Opp'n to Mot. for Summ. J. at 8.) Even resolving any doubt about whether this assertion is true in favor of Moyer, the Third Circuit rejected a similar argument in *Dykes*, where it stated:

> Significantly, [Plaintiff] could has asked a court of common pleas to order arbitration pursuant to the collective bargaining agreement thereby assuring him of the due process to which he was entitled. Because he chose not to do so, [Plaintiff] is unable to prove a violation of 42 U.S.C. § 1983.

68 F.3d at 1572. The same reasoning applies to Moyer. If he believed that Local 77 was not fulfilling its duty to fairly represent him, he could have asked a court of common pleas to order arbitration. He did not do so. Because Moyer had available to him a grievance procedure that afforded adequate due process, his Fourteenth Amendment claim fails as a matter of law. Accordingly, the court will grant the Commission's motion for summary judgment as to Count I.

### B. Pennsylvania Whistleblower Law

To establish a *prima facie* case under the Pennsylvania Whistleblower Law, Moyer must come forward with evidence that, if believed, demonstrates by a preponderance of evidence that "prior to the alleged reprisal, the employee . . . reported or was about to report in good faith, verbally or in writing, an instance of wrongdoing or waste to the employer or an appropriate authority." 43 Pa. Cons. Stat. § 1424(b). In addition, the employee "must come forward with some evidence of a connection between the report of wrongdoing and the alleged retaliatory acts." *Mosely v. City of Pittsburgh Pub. Sch. Dist.,* 702 F. Supp. 2d 561, 583 (W.D. Pa. 2010) (quoting *O'Rourke v. Commonwealth*, 778 A.2d 1194, 1200 (Pa. 2001)). In other words, a terminated employee "must show by concrete facts or surrounding

13

circumstances that the report [of wrongdoing or waste] led to [the plaintiff's] dismissal, such as that there was specific direction or information received not to file the report or [that] there would be adverse consequences because the report was filed." *Golaschevsky v. Dep't of Envtl. Prot.,* 720 A.2d 757, 759 (Pa. 1998) (quoting *Gray v. Hafer*, 651 A.2d 221, 225 (Pa. Commw. Ct. 1994) (alterations in original)). A plaintiff may not rely "solely on vague and inconclusive circumstantial evidence." *Id.* Once the employee makes out a prima facie case, the burden then shifts to the employer to show that the employee was terminated for "separate and legitimate reasons, which are not merely pretextual." 43 Pa. Cons. Stat. § 1424(c).

Moyer identifies two incidents where he asserts the he reported wrongdoing, though only one of these is identified in his Second Amended Complaint. First, "Plaintiff complained to [the Commission], as well as writing to Pa. Senators & Representatives, regarding serious issue[s] pertaining to shortages charged to employees, and serious issues with the current computer system." (Doc. 20, Sec. Amend. Compl. ¶ 33.) Second, Moyer asserts in his brief in opposition to summary judgment that his meeting with representatives from the Auditor General's Office to discuss their allegations regarding the new Fare Collection computer system constitutes a report of wrongdoing. (Doc. 32, Br. in Opp'n to Mot. for Summ. J. at 9.) From here, Moyer jumps immediately to the conclusion that his termination on May 10, 2007, was in retaliation for making these reports.[2] This is insufficient.

---

[2] Throughout the Second Amended Complaint and his brief in opposition, Moyer references his termination date as May 1, 2007. This is contrary to the evidence submitted by the Commission that Moyer was terminated effective May 10, 2007. (*See* Doc. 28, Ex. 35, Termination Ltr.) Regardless, it is immaterial to the court's analysis whether the termination occurred on May 1, 2007, or May 10, 2007.

14

At this stage of the proceedings, Moyer must come forward with some evidence demonstrating that there is a genuine issue of material fact that, if resolved in his favor, would entitle him to relief on this claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (stating that the nonmoving party may not simply sit back and rest on the allegations in its complaint; instead, it must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."). Moyer has done no such thing. Instead, he simply rehashes the arguments that he made in his complaint, and has come forward with nothing more than speculation that his reports to certain state representatives lead to the termination of his employment.

Instead of pointing to evidence that would be sufficient to establish his claim, Moyer argues that the temporal proximity of his reports and his termination is highly suggestive, and that it is an open question of fact as to when the Commission actually learned of the Auditor General's decision to conduct an audit of the Commission.

It is less than clear that the Auditor General conducted an audit, and, if so, whether it was anything other than a generally scheduled audit. The only evidence of an audit is a reference made by Jeffrey Gribb, Director of the Office of Special Investigations of the Auditor General's Office, in a June 29, 2006 letter to Moyer. In that letter, Mr. Gribb states:

> After reviewing the documents you supplied and based on your allegation that the shortage problems may be attributable to a new computer system, we have decided to refer this matter to our Bureau of Special Performance Audits for inclusion in their next regularly scheduled Special Performance Audit of the Pennsylvania Turnpike

15

> Commission. This audit is scheduled to begin in either late August of early September of 2006. Someone from the Bureau of Special Audits may be contacting you in the future with additional questions.

(Doc. 28, Def.'s Ex. 32, Ltr. from J. Gribb to D. Moyer, Jun. 29, 2006.) At best, this letter indicates that the Auditor General's Office will raise the concerns articulated by Moyer when it conducts a regular audit. The court presumes, but does not know, that this audit occurred in September 2006; however, Moyer points to no facts suggesting, when these issues were raised in a September 2006 audit, that he was identified by the Auditor General's office as the employee who raised the concern. Thus, Moyer's contention that there is an open question of fact as to when the Commission learned about his complaint, while generally true, is unhelpful to his Whistleblower claim because it does not provide the necessary nexus between this complaint and his ultimate termination.

At the latest, the Commission would have learned about Moyer's complaint to the Auditor General's office during the September 2006 audit referenced above. Moyer was not terminated until May 10, 2007. This passage of eight months, standing alone, is insufficient to allow a reasonable jury to infer causation. Courts have rejected an employee's temporal proximity argument in situations where the intervening interval was less than eight months. *See e.g., Mosely v. City of Pittsburgh Pub. Sch. Dist.,* 702 F. Supp. 2d 561, 587 (W.D. Pa. 2010) (finding that the plaintiff's termination, coming five months after his complaint, "is simply too remote to infer causation"); *Gray v. Hafer*, 651 A.2d 221, 255 (Pa. Commw. Ct. 1994) (holding that a complaint that merely alleges passage of four months between report and termination was insufficient to establish causal connection); *Golaschevsky v. Commonwealth,* 683 A.2d 1299, 1304 (Pa. Commw.

Ct. 1996) (rejecting the argument that causal connection can be inferred solely from the passage of four months between the alleged report and the retaliatory act); *Lutz v. Springettsbury Twp.*, 667 A.2d 251, 254 (Pa. Commw. Ct. 1995) (rejecting an argument that merely because termination followed a report of misconduct there was a nexus between the two).

Thus, Moyer's eight month time span is clearly insufficient to establish a causal connection. Under the Whistleblower Law, Moyer has the obligation to "show by concrete facts or surrounding circumstances that the report led to [his] dismissal." *Gray*, 651 A.2d at 225. Here, there is no evidence in the record showing the Moyer was terminated *because of* his report to the Auditor General's Office.[3] Accordingly, since Moyer bears the burden of demonstrating this at trial, the court will grant the Commission's motion for summary judgment as to Count II.

**[SPACE INTENTIONALLY LEFT BLANK]**

---

[3] It bears noting that if one were to take the date of Moyer's report to the Auditor General's Office as the relevant starting point, the time between the report and his termination would be ten months rather than eight. The court used the shorter time period to demonstrate that, even drawing all inferences in favor of Moyer, as the non-moving party, the temporal proximity is still too remote to reasonably infer causation. This is also true of Moyer's communications with Pennsylvania Senator James Rhoades, which occurred in June 2005 more than twenty-three months before his termination.

**IV.    Conclusion**

In accordance with the foregoing, the court will grant the Commission's motion for summary judgment in its entirety. Moyer has come forward with no evidence demonstrating that there is a genuine issue of material fact to be resolved at trial, and the undisputed facts before the court lead to the conclusion that Moyer's claims fail as a matter of law. The court will issue an appropriate order.

s/Sylvia H. Rambo<br>United States District Judge

Dated:  December 15, 2010.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**DONALD MOYER,**

    **Plaintiff**

    **v.**

**PA TURNPIKE COMMISSION,**

    **Defendant**

**CASE NO. 1:10-CV-0456**

**Judge Sylvia H. Rambo**

## **O R D E R**

In accordance with the accompanying memorandum of law, **IT IS HEREBY ORDERED THAT:**

(1) Defendant's Motion for Summary Judgment, (Doc. 25), is **GRANTED**;

(2) The Clerk of Court shall enter judgment for Defendant against Plaintiff and shall close the case.

                                           s/Sylvia H. Rambo
                                           United States District Judge

Dated: December 15, 2010.